**THE ROSEN LAW FIRM, P.A.**
Laurence Rosen, Esq.
One Gateway Center, Suite 2600
Newark, NJ  07102
Tel: (973) 313-1887
Fax: (973) 833-0399
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| GUILLERMO SANCHEZ, Individually and on behalf of all others similarly situated,<br><br>　　　Plaintiff,<br><br>　　　v.<br><br>HÖEGH LNG PARTNERS LP, SVEINUNG J. S. STØHLE, HÅVARD FURU, and STEFFEN FØREID,<br><br>　　　Defendants. | **Case No:**<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><u>JURY TRIAL DEMANDED</u> |

Plaintiff Guillermo Sanchez ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the

1

Defendants' public documents, conference calls and announcements made by Defendants, public filings, wire and press releases published by and regarding Höegh LNG Partners LP (the "Partnership"), and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a class action on behalf of persons or entities who purchased or otherwise acquired publicly traded Partnership securities between August 22, 2019 and July 27, 2021, inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").

2.     The Partnership was formed by Höegh LNG Holdings Ltd. ("Höegh LNG"), a leading floating liquefied natural gas ("LNG") service provider. The Partnership's purported strategy is to own, operate, and acquire floating storage and regasification units ("FSRUs") and associated LNG infrastructure assets under long-term charters. The Partnership has interests in five FSRUs, including the *PGN FSRU Lampung* based in Indonesia. Through agreements and business structures briefly described below, the Partnership has a 100% economic interest in the *PGN FSRU Lampung*.

3.     On July 27, 2021, the Partnership issued a press release which announced that: (i) the Partnership had reduced its quarterly cash distribution to $0.01 per common unit, down from a distribution of $0.44 per common unit in the first quarter of 2021; (ii) the refinancing of the *PGN FSRU Lampung* credit facility, which had been scheduled to close by the end of the second quarter of 2021, was not yet completed due to the failure by the charterer of the *PGN FSRU Lampung* to consent to and countersign certain customary documents related to the new credit facility; (iii) the *PGN FSRU Lampung* charterer stated that it will commence arbitration to declare the charter null and void, and/or to terminate the charter, and/or seek damages in relation to the operations of the vessel and its charter; (iv) the revolving credit line of $85 million from Höegh LNG will not be extended when it matures on January 1, 2023; and (v) Höegh LNG will have very limited capacity to extend any additional advances to the Partnership beyond what is currently drawn under the facility.

4.     On this news, the Partnership's common unit price fell $11.57 per common unit, or 64%, to close at $6.30 per common unit on July 28, 2021, on unusually heavy trading volume, damaging investors.

## JURISDICTION AND VENUE

5.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

6.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

7.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district.

8.      In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

9.      Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased Partnership securities during the Class Period and was economically damaged thereby.

10.     The Partnership is a limited partnership formed by Höegh LNG. the Partnership has a 100% economic interest in the *PGN FSRU Lampung*.

11.     The Partnership is incorporated in the Republic of the Marshall Islands (which is in a Compact of Free Association with the United States of America) and its head office is located at Canon's Court, 22 Victoria Street, Hamilton, HM 12, Bermuda. The Partnership's common units, representing Limited Partner interests, trade on the New York Stock Exchange ("NYSE") under the ticker symbol "HMLP."

12.     Defendant Sveinung J. S. Støhle ("Støhle") has served as the Partnership's Executive Officer ("CEO") since August 2020 and was the Partnership's Chairman of the Board of Directors from April 2014 through August 2020.

13.     Defendant Håvard Furu ("Furu") has served as the Company's Chief Financial Officer ("CFO") since August 2020.

14.     Defendant Steffen Føreid ("Føreid") served as the Company's CEO and CFO from September 2018 through August 2020.

15.     Defendants Støhle, Furu, and Føreid are collectively referred to herein as the "Individual Defendants."

16.     Each of the Individual Defendants:

(a)     directly participated in the management of the Company;

(b)     was directly involved in the day-to-day operations of the Company at the highest levels;

(c)     was privy to confidential proprietary information concerning the Company and its business and operations;

(d)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)     approved or ratified these statements in violation of the federal securities laws.

17.     The Partnership is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

18.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Partnership under *respondeat superior* and agency principles.

19.     The Partnership and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS
### Background

20.     FSRUs are multi-function vessels, which combine LNG storage and built-in regasification systems onboard a ship or barge.

21.     A time charter is a contract for the use of a vessel for a fixed period of time at a specified hire rate. Under a time charter, the vessel owner provides the crew, technical and other services related to the vessel's operation, the majority or all of the cost of which is included in the hire rate, and the charterer generally is responsible for substantially all of the vessel voyage costs (including fuel, port and canal fees and LNG boil-off).

22.     Höegh LNG is an LNG infrastructure company offering LNG transportation services, LNG regasification, terminal solutions and in-house ship management services. Höegh LNG is a Bermuda incorporated company, headquartered in Norway with established presence in Singapore, UK, USA, Indonesia, Lithuania, Egypt, Colombia, Philippines and China. In 2014, Höegh LNG contributed to the Partnership all of its equity interests in each of the

entities that own the *PGN FSRU Lampung* and the joint ventures that own the *Neptune* and the *Cape Ann*. The transfer of these equity interests by Höegh LNG to the Partnership was in connection with the Partnership's 2014 initial public offering (the "IPO"). The Partnership has an $85 million revolving credit line from Höegh LNG.

23.    *PGN FSRU Lampung* is an FSRU built in 2014 that is currently operating under a time charter with PGN LNG, a subsidiary of PT Perusahaan Gas Negara (Persero) Tbk, a subsidiary of PT Pertamina which is an Indonesian government-controlled oil and gas company. The time charter expires in 2034, with options to extend the time charter either for an additional 10 years or for up to two additional periods of five years each. *PGN FSRU Lampung* is located in the Lampung Province at the southeast coast of the island of Sumatra in Indonesia. The Partnership has a 100% economic interest in the *PGN FSRU Lampung*.

24.    PT Hoegh LNG Lampung ("PT Hoegh" or "PT Höegh") is the owner of the *PGN FSRU Lampung*.

25.    The Partnership owns a 100% equity interest in Höegh Lampung, which owns a 49% equity interest in PT Höegh.

26.    PT Bahtera Daya Utama ("PT Bahtera"), is an Indonesian company established in February 2013 which provides products and services for various energy and infrastructure projects, an Indonesian subsidiary of PT Imeco Inter

Sarana, owns the remaining 51% equity interest in PT Höegh in order to comply with local Indonesian regulations which require a local Indonesian joint venture partner (e.g., PT Bahtera). Pursuant the PT Höegh shareholders' agreement, dated March 13, 2013, between Höegh Lampung and PT Bahtera and the PT Höegh shareholder loan, the Partnership has a 100% economic interest in *PGN FSRU Lampung*.

**Materially False and Misleading**
**Statements Issued During the Class Period**

27.     On August 22, 2019, the Partnership filed with the SEC a Form 6-K signed by Defendant Føreid with a press release as an attachment. The attached press release, dated for the same day, is entitled "Höegh LNG Partners LP Reports Financial Results for the Quarter Ended June 30, 2019" and stated the following, in relevant part, emphasizing the Partnership's financial position, its revolving credit agreement with Höegh LNG, and its holding of *PGN FSRU Lampung*:

> Steffen Føreid, Chief Executive Officer and Chief Financial Officer stated: "***In the second quarter, the Partnership's modern assets continued to perform according to contract, underpinning its stable distribution***, however, the planned off-hire and maintenance during the scheduled dry-docking of two of the vessels weighted on the result. ***More broadly, global trade in LNG continues to increase year-on-year, driven by fuel-switching and new LNG production facilities coming on stream, which is fueling demand for more LNG import terminals. With an established platform of long-term contracts generating stable and predictable cash flows, Höegh LNG Partners is in a strong position to maintain its leadership position in the FSRU sector and grow*** as new opportunities crystalize."

\*      \*      \*

**Financing and Liquidity**

As of June 30, 2019, the Partnership had cash and cash equivalents of $27.1 million, an ***undrawn portion of $42.2 million of the $85 million revolving credit facility from Höegh LNG Holdings Ltd. ("Höegh LNG")*** and an undrawn $63 million revolving credit facility under the $385 million facility. … On August 13, 2019, the Partnership repaid $34.0 million on the $85 million revolving credit facility. ***As a result, the Partnership currently has undrawn balances of $76.2 million and $14.7 million on the $85 million revolving credit facility*** and $63 million revolving credit facility, respectively. Current restricted cash for operating obligations of the *PGN FSRU Lampung* was $8.0 million and long-term restricted cash required under the Lampung facility was $12.9 million as of June 30, 2019.

***During the second quarter of 2019, the Partnership made quarterly repayments of $4.8 million on the Lampung facility and $6.4 million on the $385 million facility.***

\*      \*      \*

***The Partnership believes its current resources, including the undrawn balances under the $85 million revolving credit facility and the $63 million revolving credit facility, are sufficient*** to meet the Partnership's working capital requirements for its business for the next twelve months.

(Emphasis added.)

28.    On November 21, 2019, the Partnership filed with the SEC a Form 6-K signed by Defendant Føreid with a press release as an attachment. The attached press release, dated for the same day, is entitled "Höegh LNG Partners LP Reports Financial Results for the Quarter Ended September 30, 2019" and stated the following, in relevant part, emphasizing the Partnership's financial position, its

revolving credit agreement with Höegh LNG, and its holding of *PGN FSRU Lampung*:

> Steffen Føreid, Chief Executive Officer and Chief Financial Officer stated: "***Höegh LNG Partners' assets all performed according to contract and at 100% availability in the quarter, underpinning the partnership's well-supported distribution. Driven by environmental and cost arguments, demand for FSRU services continues to be strong, enabling importing countries to access global LNG markets in a cost effective and quick manner.*** *With an established platform of long-term contracts, Höegh LNG Partners is well positioned to maintain its leadership position in the FSRU sector as growth opportunities crystalize.*"

> \*       \*       \*

> The *PGN FSRU Lampung*, the *Höegh Gallant* and the *Höegh Grace* were on-hire for the entire third quarter of 2019.

> \*       \*       \*

> As of September 30, 2019, we had cash and cash equivalents of $32.2 million. Current restricted cash for operating obligations of the *PGN FSRU Lampung* was $8.0 million and long-term restricted cash required under the Lampung facility was $12.7 million as of September 30, 2019. As of November 21, 2019, the Partnership had undrawn balances of $76.2 million and $14.7 million on the $85 million revolving credit facility and $63 million revolving credit facility, respectively.

> During the third quarter of 2019, the Partnership made quarterly repayments of $4.8 million on the Lampung facility and $6.4 million on the $385 million facility. In addition, the Partnership drew $48.3 million on the $63 million revolving credit facility and repaid $34.0 million on the $85 million revolving credit facility.

> \*       \*       \*

11

> ***The Partnership believes its current resources, including the undrawn balances under the $85 million revolving credit facility and the $63 million revolving credit facility, are sufficient*** to meet the Partnership's working capital requirements for its business for the next twelve months.

(Emphasis added.)

29.   On April 3, 2020, the Partnership filed with the SEC an annual report on Form 20-F (the "2019 Annual Report"). Attached to the 2019 Annual Report were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendant Støhle attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

30.   The 2019 Annual Report stated, in pertinent part, the following regarding distributions (including "risk" statements that were materializing or had materialized and were therefore not merely "risks"):

> ***Restrictions in our debt agreements and local laws may prevent us from paying distributions to our unitholders.***
>
> The payment of principal and interest on our debt will reduce our cash available for distribution. ***Our and our joint ventures' financing arrangements prohibit the payment of distributions upon the occurrence of certain events, including, but not limited to***:
>
> - failure to pay any principal, interest, fees, expenses or other amounts when due; …
> - breach of certain financial covenants;
> - ***failure to observe any other agreement, security instrument, obligation or covenant beyond specified cure periods in certain cases***;

- default under other indebtedness (including certain hedging arrangements or other material agreements);
- bankruptcy or insolvency events;
- inaccuracy of any representation or warranty;
- a change of ownership of the vessel-owning subsidiary, as defined in the applicable agreement; and
- **a material adverse change, as defined in the applicable agreement**.

Furthermore, our financing arrangements require that we maintain minimum amounts of free liquid assets and our subsidiaries and joint ventures to hold cash reserves that are, in certain cases, held for specifically designated uses, including working capital, operations and maintenance and debt service reserves, and are generally subject to "waterfall" provisions that allocate project revenues to specified priorities of use (such as operating expenses, scheduled debt service, targeted debt service reserves and any other reserves) and the remaining cash is distributable to us only on certain dates and subject to satisfaction of certain conditions, including meeting a 1.20 historical and in some cases, projected, debt service coverage ratio. In addition, the laws governing our joint ventures and subsidiaries may prevent us from making dividend distributions. … **Höegh Lampung is subject to Singapore laws and may make dividend distributions only out of profits. Dividends may only be paid by PT Höegh if its retained earnings are positive under Indonesian law and requirements are fulfilled under the Lampung facility. In addition, PT Höegh as an Indonesian incorporated company is required to establish a statutory reserve equal to 20% of its paid up capital. The dividend can only be distributed if PT Höegh's retained earnings are positive after deducting the statutory reserve. PT Höegh has not established the required statutory reserves as of December 31, 2019 and therefore cannot make dividend payments to us under Indonesia law. However, subject to meeting a debt service ratio of 1.20 to 1.00, PT Höegh can distribute cash from its cash flow from operations to us as payment of intercompany accrued interest and/or intercompany debt, after quarterly payments of the Lampung facility and fulfilment of the "waterfall" provisions to meet operating requirements as defined by the Lampung facility.**

(Emphasis added.)

13

31.     The 2019 Annual Report stated, in relevant part, the following, in great detail, regarding *PGN FSRU Lampung*, including that under its time charter hire is payable monthly, without noting any discontentment from any relevant party:

> As of December 31, 2019, the *Neptune*, the *Cape Ann*, the *PGN FSRU Lampung*, the *Höegh Gallant* and the *Höegh Grace* were approximately 10.2 years old, 9.6 years old, 5.8 years old, 5.2 years old and 3.8 years old, respectively. FSRUs are generally designed to have a lifespan of approximately 40 years.
>
> *              *              *
>
> **PGN FSRU Lampung Time Charter**
> Under a lease, operation and maintenance agreement, which we refer to as a time charter, we provide to PGN LNG the services of the *PGN FSRU Lampung*, which is moored at the Mooring owned by PGN LNG and located approximately 16 kilometers off the shore of Labuhan Maringgai at the southeast coast of Sumatra, Indonesia. Also, under the time charter, we operate and maintain the Mooring.
>
> *Initial Term; Extensions*
> **The long-term time charter for the PGN FSRU Lampung with PGN LNG has an initial term of 20 years from the acceptance date of October 30, 2014.** The time charter hire payments began July 21, 2014 when the project was ready to begin commissioning. At any time on or before 17 years and 183 days after acceptance, PGN LNG may exercise its option to extend the time charter for either five or 10 years. If the term is extended for five years pursuant to such option, at any time on or before the date that is 22 years and 183 days after acceptance, PGN LNG may exercise its option to extend the time charter for a subsequent five years.
>
> *              *              *
>
> *Hire Rate*
> **Under the PGN FSRU Lampung time charter, hire is payable to the vessel owner monthly, in arrears in U.S. Dollars.** The hire rate under

14

the *PGN FSRU Lampung* time charter consists of three cost components:

- *Capital Element*. The capital element is a fixed per day fee, which is intended to cover remuneration due to the vessel owner for use of the vessel and the provision of time charter services.
- *Operating and Maintenance Element*. The operating and maintenance element is a fixed per day fee, subject to annual adjustment, which is intended to cover the operating costs of the vessel, including manning costs, maintenance and repair costs, consumables and stores costs, insurance costs, management and operational costs, miscellaneous costs and alterations not required by Det Norske Veritas GL to maintain class or the IMO.
- *Tax Element*. The tax element is a fixed per day fee, equal to the vessel owner's reasonable estimate of the tax liability for that charter year divided by the number of days in such charter year. If the vessel owner receives a tax refund or credit, the vessel owner will pay such amount to the charterer. Similarly, if any audit required by the time charter reveals that the vessel owner's reasonable estimate of the tax liability varied from the actual tax liability, the vessel owner or the charterer, as applicable, will pay to the other party the difference in such amount.

If PGN LNG exercises an option to extend the *PGN FSRU Lampung* time charter beyond its initial term, the hire rate will be determined as set forth above, provided that the capital element will be increased by 50% and the operating and maintenance element will equal cost pass-through.

The hire rate is subject to adjustment if any change in Indonesian law or tax occurs that alters the vessel owner's performance of the time charter or the charterer requires the vessel owner to lay-up the vessel.

Furthermore, the hire rate is subject to deduction by the charterer for sums due in respect of the vessel owner's failure to satisfy the performance warranties or if, as a result of an event of force majeure and subject to specified exceptions, the regasification flow rate is less

than that required to meet the quantity nominated. However, any deduction for the vessel owner's failure to satisfy the performance warranties may not exceed the aggregate of the capital element and the operating and maintenance element for that day; provided, that such cap does not apply to the vessel owner's failure to satisfy specified fuel consumption or boil-off warranties.

*Expenses*
… The charterer pays for make-up of bunker fuels provided by the vessel owner and during tests; regasified LNG for use as fuel; port charges, pilotage, towing, mooring, agency fees or customs or import duties; duties, levies and taxes relating to unloading; costs and expenses relating to terminal security required by the International Ship and Port Facility Security Code (the "ISPS Code"); and mooring, periodic maintenance, repairs, insurance, inspections and surveys beyond daily inspections and capital spares. The charterer also pays for Indonesian taxes and alterations not required by Det Norske Veritas GL to maintain class or the IMO.

\*       \*       \*

**PT Höegh Shareholders' Agreement**
We own a 100% equity interest in Höegh Lampung, which owns a 49% equity interest in PT Höegh (the owner of the *PGN FSRU Lampung*). PT Bahtera, an Indonesian company established in February 2013, owns the remaining 51% equity interest in PT Höegh in order to comply with local Indonesian regulations. However, pursuant the Shareholders' Agreement, dated March 13, 2013, between Höegh Lampung and PT Bahtera ("the PT Höegh shareholders' agreement") and the PT Höegh shareholder loan, *we have a 100% economic interest in the PGN FSRU Lampung*.

\*       \*       \*

Time charter revenues for the year ended December 31, 2019 were $145.3 million, an increase of $0.4 million from $144.9 million for the year ended December 31, 2018. The increase was mainly due to higher time charter revenue for the *Höegh Grace,* which was partially offset by lower revenues for the *PGN FSRU Lampung*. … *Time charter revenues for the PGN FSRU Lampung were impacted in both the*

*year ended December 31, 2019 and 2018 by the conclusion of audits by the charterer of the final amounts that would be reimbursed for prior year expenses which resulted in the recognition of revenue that was previously considered constrained variable consideration.* However, the additional revenue recognized for reimbursement of prior year expenses was lower for the year ended December 31, 2019 compared to December 31, 2018. Refer to note 5 of our consolidated financial statements for additional information.

\*     \*     \*

Vessel operating expenses for the year ended December 31, 2019 were $30.9 million, an increase of $6.7 million from $24.2 million for the year ended December 31, 2018. The higher expenses were mainly due to maintenance expenses of approximately $4.1 million for the year ended December 31, 2019, principally for the *Höegh Gallant* but also for the *PGN FSRU Lampung*. During the scheduled drydock of the *Höegh Gallant* and the on-water survey of the *PGN FSRU Lampung*, the opportunity was utilized to complete as many maintenance procedures as possible. … *In addition, vessel operating expenses for the year ended December 31, 2019 included $3.0 million of Indonesian property tax and penalties that was assessed on the PGN FSRU Lampung for the years 2015 through 2019. The retroactive assessment was as a result of the issuance of a new regulation in 2019 defining FSRUs as subject to the existing Indonesian property tax law.*

\*     \*     \*

The interest incurred of $25.1 million for the year ended December 31, 2019 decreased by $1.0 million compared to $26.1 million for the year ended December 31, 2018, principally due to repayment between periods of the outstanding loan balances for the loan facility related to the *PGN FSRU Lampung* (the "Lampung facility").

\*     \*     \*

Time charter revenues for the year ended December 31, 2019 were $145.3 million, an increase of $0.4 million from $144.9 million for the year ended December 31, 2018. As discussed above, the increase was

mainly due to higher time charter revenue for the *Höegh Grace,* which was partially offset by lower revenues for the *PGN FSRU Lampung*. … Time charter revenues for the *PGN FSRU Lampung* were impacted in both the year ended December 31, 2019 and 2018 by the conclusion of audits by the charterer of the final amounts that would be reimbursed for prior year expenses which resulted in the recognition of revenue that was previously considered constrained variable consideration. However, the additional revenue recognized for reimbursement of prior year expenses was lower for the year ended December 31, 2019 compared to December 31, 2018. Refer to note 5 of our consolidated financial statements for additional information. …

Other revenue for the years ended December 31, 2019 and 2018 consists of insurance proceeds received for a claim related to the *PGN FSRU Lampung's* warranty work from prior periods the insurance recovery for 2018 repair expenses incurred for the *Höegh Gallant*.

Vessel operating expenses for the year ended December 31, 2019 were $30.9 million compared to $24.2 million for the year ended December 31, 2018. The higher expenses were mainly due to maintenance expenses of approximately $4.1 million for the year ended December 31, 2019, principally for the *Höegh Gallant* but also for the *PGN FSRU Lampung*. During the scheduled drydock of the *Höegh Gallant* and the on-water survey of the *PGN FSRU Lampung*, the opportunity was utilized to complete as many maintenance procedures as possible. For the year ended December 31, 2018, vessel operating expenses included repair expenses incurred for the *Höegh Gallant* due to technical issues in the fourth quarter of 2018. In addition, vessel operating expenses for the year ended December 31, 2019 included $3.0 million of Indonesian property tax and penalties that was assessed on the *PGN FSRU Lampung* for the years 2015 through 2019. The retroactive assessment was as a result of the issuance of a new regulation in 2019, defining FSRUs as subject to the existing Indonesian property tax law.

\* \* \*

As of December 31, 2019, the Partnership had cash and cash equivalents of $39.1 million. Current restricted cash for operating obligations of the *PGN FSRU Lampung* was $8.0 million and long-term restricted cash required under the Lampung facility was $12.6

million as of December 31, 2019. The long-term debt is repayable in quarterly installments of $11.2 million starting with the first repayment under the $385 million facility in April 2019. As of March 31, 2020, the Partnership had undrawn balances of $76.2 million and $14.7 million on the $85 million revolving credit facility and $63 million revolving credit tranche, respectively.

\*      \*      \*

The Lampung facility identifies various events that may trigger mandatory reduction, prepayment and cancellation of the facility, including total loss or sale of the *PGN FSRU Lampung*. The Lampung facility contains customary events of default such as:

- change of ownership;
- inaccuracy of representations and warranties;
- failure to repay principal and interest;
- failure to comply with the financial or insurance covenants;
- cross-default to other indebtedness held by Höegh LNG or PT Höegh;
- bankruptcy and other insolvency events at Höegh LNG or PT Höegh;
- occurrence of certain litigation events at Höegh LNG or PT Höegh;
- the occurrence of a material adverse effect in respect of Höegh LNG, PT Höegh or the charterer;
- breach by the contractor of any technical services agreement, master maintenance agreement or a master parts agreement pertaining to the vessel;
- termination or breach of the charter; and
- cross-default to certain material project contracts.

\*      \*      \*

The *PGN FSRU Lampung* time charter, which had a 20-year lease term at inception, meets the criteria of transferring substantially all of the benefits and risks to the charterer and is accounted for as a financing lease.

19

\*   \*   \*

**Concentration of Risk**

… While the maximum exposure to loss due to credit risk is the book value of trade receivables at the balance sheet date, should the time charters for the *PGN FSRU Lampung* or the *Höegh Grace* terminate prematurely, or Höegh LNG prematurely terminate the future time charter under the option exercised for the *Höegh Gallant*, or the option to acquire the *PGN FSRU Lampung* be exercised*,* there could be delays in obtaining new time charters and the hire rates could be lower depending upon the prevailing market conditions.

\*   \*   \*

On August 12, 2014, the Partnership completed its IPO. Prior to the closing of the IPO, Höegh LNG contributed to the Partnership all of its equity interests and loans and promissory notes due to it and affiliates in each of the entities owning the *Neptune*, the *Cape Ann* and the *PGN FSRU Lampung*.

\*   \*   \*

The *PGN FSRU Lampung*, operates under a long term time charter which started in July 2014 with an expiration date in 2034, with an option for the charterer to extend for up to two additional periods of five years each, and uses the Mooring that was constructed, installed and sold to the charterer, PT PGN LNG Indonesia ("PGN LNG"), a subsidiary of PT Perusahaan Gas Negara (Persero) Tbk ("PGN"), a subsidiary of PT Pertamina, a government-controlled, Indonesian oil and gas producer, natural gas transportation and distribution company.

\*   \*   \*

***The hire rates for the PGN FSRU Lampung and the joint ventures are invoiced at the beginning of the month.***

\*     \*     \*

The *PGN FSRU Lampung* time charter, which had a 20-year lease term at inception, meets the criteria of transferring substantially all of the benefits and risks to the charterer and is accounted for as a financing lease.

\*     \*     \*

***Minimum contractual future revenues***:

As of December 31, 2019, the minimum contractual future revenues to be received under the time charters for the *PGN FSRU Lampung,* the *Höegh Gallant* and the *Höegh Grace* during the next five years and thereafter are as follows:

| (in thousands of U.S. dollars) | Service related | Lease related | Total |
|---|---|---|---|
| 2020 | $        24,880 | 71,100 | $       95,980 |
| 2021 | 19,703 | 59,903 | 79,606 |
| 2022 | 19,703 | 59,903 | 79,606 |
| 2023 | 19,703 | 59,903 | 79,606 |
| 2024 | 19,703 | 59,903 | 79,606 |
| Thereafter | 116,386 | 346,369 | 462,755 |
| Total - undiscounted | $      220,078 | 657,081 | $     877,159 |
| Operating lease | | $      223,644 | |
| Financing lease | | 433,437 | |
| Discounting effect | | (193,437) | |
| Financing lease receivable | | $      240,000 | |

The long-term time charter for the *PGN FSRU Lampung* with PGN LNG has an initial term of 20 years from the acceptance date of October 30, 2014 and the contract expires in 2034. The time charter hire payments began July 21, 2014 when the project was ready to begin commissioning. The lease element of the time charter is accounted for as a financing lease. The minimum contractual future revenues in the table above include the fixed payments for the lease and services elements for the initial term but exclude the variable fees from the charterer for vessel operating expenses and reimbursement of tax expenses. The charterer has an option to purchase the *PGN FSRU Lampung,* which can be exercised after the third anniversary of the commencement of the charter until the twentieth anniversary, at stated prices in the time charter. The minimum contractual future revenues do

21

not include the unexercised purchase option price. Should the purchase option be exercised in the short to medium term, the contractual price would exceed the net investment in financing lease, but the future hire payments would cease. The time charter also provides options for the charterer to extend the lease term for two five-year periods. Unexercised option periods are excluded from the minimum contractual future revenues.

*      *      *

*Lampung facility*

In September 2013, PT Hoegh LNG Lampung (the "Borrower") entered into a secured $299 million term loan facility (the "Lampung facility") with a syndicate of banks and an export credit agency for the purpose of financing a portion of the construction of the *PGN FSRU Lampung* and the Mooring. Höegh LNG is the guarantor for the Lampung facility. The facility was drawn in installments as construction was completed. The term loan facility includes two commercial tranches, the FSRU tranche and the Mooring tranche, and the export credit tranche. The interest rates vary by tranche. The full principal amount on the Mooring tranche and accrued interest was repaid in 2014.

The FSRU tranche has an interest rate of LIBOR plus a margin of 3.4%. The interest rate for the export credit tranche is LIBOR plus a margin of 2.3%. The FSRU tranche is repayable quarterly over 7 years with a final balloon payment of $16.5 million. The export credit tranche is repayable in quarterly installments over 12 years ***assuming the balloon payment of the FSRU tranche is refinanced. If not, the export credit agent can exercise a prepayment right for repayment of the outstanding balance upon maturity of the FSRU tranche***. The weighted average interest rate, excluding the impact of the associated interest rate swaps, for the years ended December 31, 2019 and 2018 was 6.2% and 5.9% respectively.

The primary financial covenants under the Lampung facility are as follows:

- Borrower must maintain a minimum debt service coverage ratio of 1.10 to 1.00 for the preceding nine-

22

- month period tested on each quarterly repayment date;
- Guarantor's book equity must be greater than the higher of (i) $200 million and (ii) 25% of total assets; and
- Guarantor's free liquid assets (cash and cash equivalents or available draws on credit facilities) must be greater than $20 million.

As of December 31, 2019 and 2018, the Borrower and the guarantor were in compliance with the financial covenants.

\*     \*     \*

Höegh LNG, as guarantor, has issued the following guarantees related to the Lampung facility that remain in effect as of December 31, 2019: (a) an unconditional and irrevocable on-demand guarantee for the repayment of the balloon repayment installment of the FSRU tranche callable only at final maturity of the FSRU tranche; (b) an unconditional and irrevocable on-demand guarantee for all amounts due in respect of the export credit agent in the event that the export credit agent exercises its prepayment right for the export credit tranche if the FSRU tranche is not refinanced; and (c) undertaking that, if the time charter is terminated for an event of vessel force majeure, that under certain conditions, a guarantee will be provided for the outstanding debt, less insurance proceeds for vessel force majeure. In addition, all project agreements and guarantees are assigned to the bank syndicate and the export credit agent, all cash accounts and the shares in PT Hoegh LNG Lampung and Hoegh LNG Lampung Pte. Ltd. are pledged in favor of the bank syndicate and the export credit agent.

The Lampung facility requires cash reserves that are held for specifically designated uses, including working capital, operations and maintenance and debt service reserves. Distributions are subject to "waterfall" provisions that allocate revenues to specified priorities of use (such as operating expenses, scheduled debt service, targeted debt service reserves and any other reserves) with the remaining cash being distributable only on certain dates and subject to satisfaction of certain conditions, including meeting a 1.20 historical debt service coverage ratio, no default or event of default then continuing or resulting from such distribution and the guarantor not being in breach of the financial covenants applicable to it. The Lampung facility limits, among other

things, the ability of the Borrower to change its business, sell or grant liens on its property including the *PGN FSRU Lampung*, incur additional indebtedness or guarantee other indebtedness, make investments or acquisitions, enter into intercompany transactions and make distributions.

*       *       *

**Credit risk**

… In order to minimize counterparty risk, bank relationships are established with counterparties with acceptable credit ratings at the time of the transactions. Credit risk related to receivables is limited by performing ongoing credit evaluations of the customers' or counterparty's financial condition. **PGN guarantees PGN LNG's obligations under the PGN FSRU Lampung time charter.** The other time charters do not have parent company guarantees.

(Emphasis added.)

32.    The 2020 Annual Report stated, in pertinent part, the following regarding its debt, its relationship with Höegh LNG, and the COVID-19 pandemic:

> ***The debt levels of us and our joint ventures may limit our and their flexibility in obtaining additional financing, refinancing credit facilities upon maturity or pursuing other business opportunities or our paying distributions to you.***
>
> As of December 31, 2019, we had outstanding principal on long-term bank debt of $466.1 million, and revolving credit due to owners and affiliates of $8.8 million and our joint ventures had outstanding principal on long-term debt of $202.1 million, of which 50% is our share. …
>
> As of March 31, 2020, we had outstanding principal on long-term bank debt of $455.0 million and revolving credit due to owners and affiliates of $8.8 million and our 50% share of our joint ventures had outstanding principal on long-term debt of $397.3 million. In addition, we have the ability to incur additional debt, and ***as of March 31, 2020 we had the ability to borrow an additional $76.2 million under our $85 million***

*revolving credit facility with Höegh LNG* and $14.7 million on the $63 million revolving credit tranche of the $385 million facility, subject to certain limitations. If we acquire additional vessels or businesses, our consolidated debt may significantly increase. We may incur additional debt under these or future credit facilities. Our joint ventures' credit facilities will mature in 2022 and require an aggregate principal repayment of approximately $330 million, of which 50% is our share. *A portion of the credit facility secured by the PGN FSRU Lampung will mature in 2021 and requires that an aggregate principal amount of $16.5 million be refinanced. If such principal repayment is not refinanced, the export credit tranche of the PGN FSRU Lampung financing that will have an outstanding balance of $68.2 million at this time may be accelerated together with the attendant hedges*. …

Our level of debt could have important consequences to us, including the following:

- our ability to obtain additional financing, if necessary, for working capital, capital expenditures, acquisitions or other purposes may be limited, or such financing may not be available on favorable terms;
- *we will need a substantial portion of our cash flows to make principal and interest payments on our debt*, reducing the funds that would otherwise be available for operations, future business opportunities and distributions to unitholders;
- our debt level will make us more vulnerable than our competitors with less debt to competitive pressures or a downturn in our business or the economy generally;
- our debt level may limit our flexibility in responding to changing business and economic conditions; and
- if we are unable to satisfy the restrictions included in any of our financing arrangements or are otherwise in default under any of those arrangements, as a result of our debt levels or otherwise, we will not be able to make cash distributions to you, notwithstanding our stated cash distribution policy.

25

Our ability to service or refinance our debt will depend on, among other things, our future financial and operating performance, which will be affected by prevailing economic conditions and financial, business, regulatory and other factors, some of which are beyond our control. ***If our operating results are not sufficient to service or refinance our current or future indebtedness, we will be forced to take actions such as reducing distributions***, reducing or delaying our business activities, acquisitions, investments or capital expenditures, selling assets, restructuring our debt, or seeking additional equity capital or bankruptcy protection. We may not be able to effect any of these remedies on satisfactory terms, or at all. ***In addition, the recent Coronavirus outbreak has negatively impacted, and may continue to negatively impact, global economic activity, demand for energy (including LNG and LNG shipping) and funds flows and sentiment in the global financial markets. Continued economic disruption caused by the continued failure to control the spread of the virus could significantly impact our ability to obtain additional debt financing.***

\*     \*     \*

Our sources of liquidity include cash balances, cash flows from our operations, interest payments from our advances to our joint ventures, ***our undrawn balance of $76.2 million under the $85 million revolving credit facility from Höegh LNG*** and our undrawn balance of $14.7 million under the $63 million revolving credit tranche of our $385 million facility, as further described below.

(Emphasis added.)

33.     On April 9, 2021, the Partnership filed with the SEC an annual report on Form 20-F (the "2020 Annual Report"). Attached to the 2020 Annual Report were certifications pursuant to SOX signed by Defendants Støhle and Furu attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

34.    The 2020 Annual Report stated, in pertinent part, the following regarding distributions as a "risk" statement that was instead materializing or had materialized and were therefore not merely a "risk"):

> **Restrictions in our debt agreements and local laws may prevent us from paying distributions to our unitholders.**
>
> The payment of principal and interest on our debt will reduce our cash available for distribution. **Our and our joint ventures' financing arrangements prohibit the payment of distributions upon the occurrence of certain events, including, but not limited to:**
> - failure to pay any principal, interest, fees, expenses or other amounts when due;
> - certain material environmental incidents;
> - breach or lapse of insurance with respect to vessels securing the facilities;
> - breach of certain financial covenants;
> - **failure to observe any other agreement, security instrument, obligation or covenant beyond specified cure periods in certain cases**;
> - default under other indebtedness (including certain hedging arrangements or other material agreements);
> - bankruptcy or insolvency events;
> - inaccuracy of any representation or warranty;
> - a change of ownership of the vessel-owning subsidiary, as defined in the applicable agreement; and
> - **a material adverse change, as defined in the applicable agreement**.
>
> *Furthermore, our financing arrangements require that we maintain minimum amounts of free liquid assets and our subsidiaries and joint ventures to hold cash reserves that are, in certain cases, held for specifically designated uses, including working capital, operations and maintenance and debt service reserves, and are generally subject to "waterfall" provisions that allocate project revenues to specified priorities of use* (such as operating expenses, scheduled debt service, targeted debt service reserves and any other reserves) and the remaining

cash is distributable to us only on certain dates and subject to satisfaction of certain conditions, including meeting a 1.20 historical and in some cases, projected, debt service coverage ratio. In addition, the laws governing our joint ventures and subsidiaries may prevent us from making dividend distributions. … ***Höegh Lampung is subject to Singapore laws and may make dividend distributions only out of profits. Dividends may only be paid by PT Höegh if its retained earnings are positive under Indonesian law and requirements are fulfilled under the Lampung facility. In addition, PT Höegh as an Indonesian incorporated company is required to establish a statutory reserve equal to 20% of its paid up capital. The dividend can only be distributed if PT Höegh's retained earnings are positive after deducting the statutory reserve. PT Höegh is in the process of establishing the required statutory reserves as of December 31, 2020 and therefore cannot make dividend payments to us under Indonesia law. However, subject to meeting a debt service ratio of 1.20 to 1.00, PT Höegh can distribute cash from its cash flow from operations to us as payment of intercompany accrued interest and / or intercompany debt, after quarterly payments of the Lampung facility and fulfilment of the "waterfall" provisions to meet operating requirements as defined by the Lampung facility.***

(Emphasis added.)

35.     The 2020 Annual Report stated, in relevant part, the following, in great detail, regarding PGN FSRU Lampung, including that under its time charter hire is payable monthly, without noting any discontentment from any relevant party:

As of December 31, 2020, the *Neptune*, the *Cape Ann*, the *PGN FSRU Lampung,* the *Höegh Gallant* and the *Höegh Grace* were approximately 11.2 years old, 10.6 years old, 6.8 years old, 6.2 years old and 4.8 years old, respectively. FSRUs are generally designed to have a lifespan of approximately 40 years.

*         *         *

***PGN FSRU Lampung Time Charter***

28

Under a lease, operation and maintenance agreement, which we refer to as a time charter, we provide to PGN LNG the services of the *PGN FSRU Lampung*, which is moored at the Mooring owned by PGN LNG and located approximately 16 kilometers off the shore of Labuhan Maringgai at the southeast coast of Sumatra, Indonesia. Also, under the time charter, we operate and maintain the Mooring.

*Initial Term; Extensions*

**The long-term time charter for the PGN FSRU Lampung with PGN LNG has an initial term of 20 years from the acceptance date of October 30, 2014.** The time charter hire payments began July 21, 2014 when the project was ready to begin commissioning. At any time on or before 17 years and 183 days after acceptance, PGN LNG may exercise its option to extend the time charter for either five or 10 years. If the term is extended for five years pursuant to such option, at any time on or before the date that is 22 years and 183 days after acceptance, PGN LNG may exercise its option to extend the time charter for a subsequent five years.

*Performance Standards*

Under the *PGN FSRU Lampung* time charter, the vessel owner makes certain performance warranties for the term of the time charter, excluding time during which the vessel is off-hire or in lay-up or a failure to satisfy any such warranty due to a "Lampung Charterer Risk Event" (which includes, among other things, any breach, act, interference or omission by the charterer that prevents or interferes with the vessel owner's performance under the time charter) or an event of force majeure, including the following:

- the management warranties, which consist of the following: …
  o the vessel owner loads LNG in accordance with specified procedures; operates all equipment in a safe and proper manner and as required by Indonesian law; keeps up-to-date records and logs; ***uses reasonable endeavors to cooperate with the charterer to comply with and satisfy any requirements of any governmental authority***; ***stows LNG properly and keeps a strict account of all LNG***

*loaded, boil-off and regasified LNG discharged*; and exercises due diligence and good industry practice to minimize venting of boil-off; …

*Hire Rate*

**Under the PGN FSRU Lampung time charter, hire is payable to the vessel owner monthly, in arrears in U.S. Dollars.** The hire rate under the *PGN FSRU Lampung* time charter consists of three cost components:

- Capital Element. **The capital element is a fixed per day fee**, which is intended to cover remuneration due to the vessel owner for use of the vessel and the provision of time charter services.

- *Operating and Maintenance Element*. **The operating and maintenance element is a fixed per day fee, subject to annual adjustment**, which is intended to cover the operating costs of the vessel, including manning costs, maintenance and repair costs, consumables and stores costs, insurance costs, management and operational costs, miscellaneous costs and alterations not required by Det Norske Veritas GL to maintain class or the IMO.

- *Tax Element*. The tax element is a fixed per day fee, equal to the vessel owner's reasonable estimate of the tax liability for that charter year divided by the number of days in such charter year. If the vessel owner receives a tax refund or credit, the vessel owner will pay such amount to the charterer. Similarly, if any audit required by the time charter reveals that the vessel owner's reasonable estimate of the tax liability varied from the actual tax liability, the vessel owner or the charterer, as applicable, will pay to the other party the difference in such amount.

If PGN LNG exercises an option to extend the *PGN FSRU Lampung* time charter beyond its initial term, the hire rate will be determined as set forth above, provided that the capital element will be

increased by 50% and the operating and maintenance element will equal cost pass-through.

The hire rate is subject to adjustment if any change in Indonesian law or tax occurs that alters the vessel owner's performance of the time charter or the charterer requires the vessel owner to lay-up the vessel.

Furthermore, the hire rate is subject to deduction by the charterer for sums due in respect of the vessel owner's failure to satisfy the performance warranties or if, as a result of an event of force majeure and subject to specified exceptions, the regasification flow rate is less than that required to meet the quantity nominated. However, any deduction for the vessel owner's failure to satisfy the performance warranties may not exceed the aggregate of the capital element and the operating and maintenance element for that day; provided, that such cap does not apply to the vessel owner's failure to satisfy specified fuel consumption or boil-off warranties.

The charterer will pay the vessel owner the hire rate for time lost due to a Lampung Charterer Risk Event.

*Expenses*
… The charterer pays for make-up of bunker fuels provided by the vessel owner and during tests; regasified LNG for use as fuel; port charges, pilotage, towing, mooring, agency fees or customs or import duties; duties, levies and taxes relating to unloading; costs and expenses relating to terminal security required by the International Ship and Port Facility Security Code (the "ISPS Code"); and mooring, periodic maintenance, repairs, insurance, inspections and surveys beyond daily inspections and capital spares. The charterer also pays for Indonesian taxes and alterations not required by Det Norske Veritas GL to maintain class or the IMO.

*       *       *

*Purchase Option*
PGN LNG was granted an option to purchase the *PGN FSRU Lampung* at specified prices based upon the year in which the option is exercised. Such option to purchase may be exercised commencing in June 2018; however, it may not be exercised if either of the charter

extension options has expired without exercise. The option is exercisable upon PGN LNG giving us notice specifying the time and date of delivery, which must be after the third anniversary of the date of delivery. The option to purchase survives termination of the time charter. *PGN LNG has discussed alternatives regarding the option, among other contractual provisions. However, no notice has been provided to indicate an intention of exercising this option as of March 31, 2021.* Please read "Item 3.D. Risk Factors—Risks Inherent in Our Business—PGN LNG and SPEC have options to purchase the *PGN FSRU Lampung* and *Höegh Grace*, respectively. If either charterer exercises its option, it could have a material adverse effect on our operating cash flows and our ability to make cash distributions to our unitholders."

\*      \*      \*

***PT Höegh Shareholders' Agreement***
We own a 100% equity interest in Höegh Lampung, which owns a 49% equity interest in PT Höegh (the owner of the *PGN FSRU Lampung*). PT Bahtera, an Indonesian company established in February 2013, owns the remaining 51% equity interest in PT Höegh in order to comply with local Indonesian regulations. However, pursuant the Shareholders' Agreement, dated March 13, 2013, between Höegh Lampung and PT Bahtera ("the PT Höegh shareholders' agreement") and the PT Höegh shareholder loan, *we have a 100% economic interest in the PGN FSRU Lampung*.

\*      \*      \*

Time charter revenues for the year ended December 31, 2020 were $143.1 million, a decrease of $2.2 million from $145.3 million for the year ended December 31, 2019. The decrease was mainly due to lower time charter revenues for the Höegh Gallant and for the PGN FSRU Lampung. … *Time charter revenues for the PGN FSRU Lampung were impacted in the year ended December 31, 2019 by the conclusion of audits by the charterer of the final amounts that would be reimbursed for prior year expenses which resulted in the recognition of revenue that was previously considered constrained variable consideration.* … *The PGN FSRU Lampung and the Höegh*

32

*Grace were both on-hire for the full periods ended December 31, 2020 and 2019.*

\*       \*       \*

Vessel operating expenses for the year ended December 31, 2020 were $24.1 million, a decrease of $6.8 million from $30.9 million for the year ended December 31, 2019. The lower expenses were mainly due to maintenance expenses of approximately $4.1 million for the year ended December 31, 2019, principally for the *Höegh Gallant* but also for the *PGN FSRU Lampung*. During the scheduled drydock of the *Höegh Gallant* and the on-water survey of the PGN FSRU Lampung, the opportunity was utilized to complete as many maintenance procedures as possible. In addition, vessel operating expenses for the year ended December 31, 2019 included $3.0 million of Indonesian property tax and penalties that was assessed on the PGN FSRU Lampung for the years 2015 through 2019. The retroactive assessment was as a result of the issuance of a new regulation in 2019 defining FSRUs as subject to the existing Indonesian property tax law.

\*       \*       \*

The interest incurred of $21.8 million for the year ended December 31, 2020 decreased by $3.3 million compared to $25.1 million for the year ended December 31, 2019. *The decrease was principally due to repayment of outstanding loan balances for the loan facilities related to the PGN FSRU Lampung (the "Lampung facility")* and the commercial and export tranches of the $385 million facility financing the *Höegh Gallant*, the *Höegh Grace* and the Partnership's liquidity needs (the "$385 million facility").

\*       \*       \*

Time charter revenues for the year ended December 31, 2020 were $143.1 million, a decrease of $2.2 million from $145.3 million for the year ended December 31, 2019. *As discussed above, the decrease was mainly due to lower time charter revenues for the Höegh Grace and for the PGN FSRU Lampung. … Time charter revenues for the PGN FSRU Lampung were impacted in the year ended December 31, 2019 by the conclusion of audits by the charterer of the final amounts that*

*would be reimbursed for prior year expenses which resulted in the recognition of revenue that was previously considered constrained variable consideration.* … *The PGN FSRU Lampung and the Höegh Grace were both on-hire for the full periods ended December 31, 2020 and 2019.* …

Vessel operating expenses for the year ended December 31, 2020 were $24.1 million compared to $30.9 million for the year ended December 31, 2019. The lower expenses were mainly due to maintenance expenses of approximately $4.1 million for the year ended December 31, 2019, principally for the *Höegh Gallant* but also for the *PGN FSRU Lampung*. During the scheduled drydock of the *Höegh Gallant* and the on-water survey of the *PGN FSRU Lampung*, the opportunity was utilized to complete as many maintenance procedures as possible. *In addition, vessel operating expenses for the year ended December 31, 2019 included $3.0 million of Indonesian property tax and penalties that was assessed on the PGN FSRU Lampung for the years 2015 through 2019. The retroactive assessment was as a result of the issuance of a new regulation in 2019, defining FSRUs as subject to the existing Indonesian property tax law.*

\*      \*      \*

As of December 31, 2020, we had cash and cash equivalents of $31.8 million. *Current restricted cash for operating obligations of the PGN FSRU Lampung was $7.2 million and long-term restricted cash required under the Lampung facility was $12.1 million as of December 31, 2020. As of March 31, 2021, we had undrawn balances of $66.8 million and $14.7 million on the $85 million revolving credit facility and $63 million revolving credit tranche, respectively.*

In September 2013, PT Höegh (the "Borrower") entered into a secured $299 million term loan facility (the "Lampung facility") with a syndicate of banks and an export credit agency for the purpose of financing a portion of the construction of the *PGN FSRU Lampung* and the Mooring. Höegh LNG is the guarantor for the Lampung facility. The facility was drawn in installments as construction was completed. The term loan facility includes two commercial tranches, the FSRU tranche and the Mooring tranche, and the export credit tranche. The

34

interest rates vary by tranche. The full principal amount on the Mooring tranche and accrued interest was repaid in 2014.

*     *     *

The Lampung facility identifies various events that may trigger mandatory reduction, prepayment and cancellation of the facility, including total loss or sale of the *PGN FSRU Lampung*. The Lampung facility contains customary events of default such as:

- change of ownership;

- inaccuracy of representations and warranties;

- failure to repay principal and interest;

- failure to comply with the financial or insurance covenants;

- cross-default to other indebtedness held by Höegh LNG or PT Höegh;

- bankruptcy and other insolvency events at Höegh LNG or PT Höegh;

- occurrence of certain litigation events at Höegh LNG or PT Höegh;

- the occurrence of a material adverse effect in respect of Höegh LNG, PT Höegh or the charterer;

- breach by the contractor of any technical services agreement, master maintenance agreement or a master parts agreement pertaining to the vessel;

- ***termination or breach of the charter***; and

- cross-default to certain material project contracts.

*     *     *

The lease component of time charters that are accounted for as financing leases is recognized over the lease term using the effective interest rate method and is included in time charter revenues. Origination costs related to the time charter are a component of the net investment in financing lease and amortized over the lease term using the effective interest method. Financing leases are reflected on the consolidated balance sheets as net investments in financing leases.

*The PGN FSRU Lampung time charter, which had a 20-year lease term at inception, meets the criteria of transferring substantially all of the benefits and risks to the charterer and is accounted for as a financing lease.*

\*        \*        \*

**Concentration of Risk**

… While the maximum exposure to loss due to credit risk is the book value of trade receivables at the balance sheet date, should the time charters for the *PGN FSRU Lampung* or the *Höegh Grace* terminate prematurely, or Höegh LNG prematurely terminate the future time charter under the option exercised for the *Höegh Gallant*, or the option to acquire the *PGN FSRU Lampung* be exercised, there could be delays in obtaining new time charters and the hire rates could be lower depending upon the prevailing market conditions.

\*        \*        \*

On August 12, 2014, the Partnership completed its IPO. Prior to the closing of the IPO, Höegh LNG contributed to the Partnership all of its equity interests and loans and promissory notes due to it and affiliates in each of the entities owning the Neptune, the Cape Ann and the PGN FSRU Lampung.

\*        \*        \*

*The PGN FSRU Lampung, operates under a long term time charter which started in July 2014 with an expiration date in 2034, with an option for the charterer to extend for up to two additional periods of five years each*, and uses the Mooring that was constructed, installed and sold to the charterer, PT PGN LNG Indonesia ("PGN LNG"), a subsidiary of PT Perusahaan Gas Negara (Persero) Tbk ("PGN"), a subsidiary of PT Pertamina, a government-controlled, Indonesian oil and gas producer, natural gas transportation and distribution company.

\*        \*        \*

*The hire rates for the PGN FSRU Lampung and the joint ventures are invoiced at the beginning of the month.*

*       *       *

The lease component of time charters that are accounted for as financing leases is recognized over the lease term using the effective interest rate method and is included in time charter revenues. Origination costs related to the time charter are a component of the net investment in financing lease and amortized over the lease term using the effective interest method. Financing leases are reflected on the consolidated balance sheets as net investments in financing leases. **_The PGN FSRU Lampung time charter, which had a 20-year lease term at inception, meets the criteria of transferring substantially all of the benefits and risks to the charterer and is accounted for as a financing lease._**

*       *       *

**_Minimum contractual future revenues_**:
As of December 31, 2020, the minimum contractual future revenues to be received under the time charters for the _PGN FSRU Lampung,_ the _Höegh Gallant_ and the _Höegh Grace_ during the next five years and thereafter are as follows:

| (in thousands of U.S. dollars) | Service related | Lease related | Total |
|---|---|---|---|
| 2021 | $   32,369 | 90,441 | $122,810 |
| 2022 | 32,369 | 90,441 | 122,810 |
| 2023 | 32,369 | 90,441 | 122,810 |
| 2024 | 32,369 | 90,441 | 122,810 |
| 2025 | 27,091 | 77,717 | 104,808 |
| Thereafter | 96,683 | 286,467 | 383,150 |
| Total - undiscounted | $  253,250 | 725,948 | $979,198 |
| Operating lease | | $ 321,724 | |
| Financing lease | | 404,224 | |
| Discounting effect | | (172,499) | |
| Financing lease receivable | | $ 231,725 | |

The long-term time charter for the _PGN FSRU Lampung_ with PGN LNG has an initial term of 20 years from the acceptance date of October 30, 2014 and the contract expires in 2034. The time charter hire payments began July 21, 2014 when the project was ready to begin commissioning. The lease element of the time charter is accounted for

as a financing lease. The minimum contractual future revenues in the table above include the fixed payments for the lease and services elements for the initial term but exclude the variable fees from the charterer for vessel operating expenses and reimbursement of tax expenses. The charterer has an option to purchase the *PGN FSRU Lampung,* which can be exercised after the third anniversary of the commencement of the charter until the twentieth anniversary, at stated prices in the time charter. … The time charter also provides options for the charterer to extend the lease term for two five-year periods. …

*Lampung facility*

In September 2013, PT Hoegh LNG Lampung (the "Borrower") entered into a secured $299 million term loan facility (the "Lampung facility") with a syndicate of banks and an export credit agency for the purpose of financing a portion of the construction of the *PGN FSRU Lampung* and the Mooring. Höegh LNG is the guarantor for the Lampung facility. The facility was drawn in installments as construction was completed. The term loan facility includes two commercial tranches, the FSRU tranche and the Mooring tranche, and the export credit tranche. The interest rates vary by tranche. The full principal amount on the Mooring tranche and accrued interest was repaid in 2014.

The FSRU tranche has an interest rate of LIBOR plus a margin of 3.4%. The interest rate for the export credit tranche is LIBOR plus a margin of 2.3%. ***The FSRU tranche is repayable quarterly over 7 years with a final balloon payment of $15.5 million due on October 30, 2021.*** The export credit tranche is repayable in quarterly installments over 12 years ***assuming the balloon payment of the FSRU tranche is refinanced. If not, the export credit agent can exercise a prepayment right for repayment of the outstanding balance upon maturity of the FSRU tranche.*** The weighted average interest rate, excluding the impact of the associated interest rate swaps, for the years ended December 31, 2020 and 2019 was 4.7% and 6.2% respectively.

The primary financial covenants under the Lampung facility are as follows:

- Borrower must maintain a minimum debt service coverage ratio of 1.10 to 1.00 for the preceding nine-month period tested on each quarterly repayment date;

- Guarantor's book equity must be greater than the higher of (i) $200 million and (ii) 25% of total assets; and
- Guarantor's free liquid assets (cash and cash equivalents or available draws on credit facilities) must be greater than $20 million.

As of December 31, 2020 and 2019, the Borrower and the guarantor were in compliance with the financial covenants.

***Höegh LNG, as guarantor, has issued the following guarantees related to the Lampung facility that remain in effect as of December 31, 2020: (a) an unconditional and irrevocable on-demand guarantee for the repayment of the balloon repayment installment of the FSRU tranche callable only at final maturity of the FSRU tranche; (b) an unconditional and irrevocable on-demand guarantee for all amounts due in respect of the export credit agent in the event that the export credit agent exercises its prepayment right for the export credit tranche if the FSRU tranche is not refinanced;*** and (c) an undertaking that, if the time charter is terminated for an event of vessel force majeure, under certain conditions, a guarantee will be provided for the outstanding debt, less insurance proceeds for vessel force majeure. In addition, all project agreements and guarantees are assigned to the bank syndicate and the export credit agent, all cash accounts and the shares in PT Hoegh LNG Lampung and Hoegh LNG Lampung Pte. Ltd. are pledged in favor of the bank syndicate and the export credit agent.

The Lampung facility requires cash reserves that are held for specifically designated uses, including working capital, operations and maintenance and debt service reserves. … The Lampung facility limits, among other things, the ability of the Borrower to change its business, sell or grant liens on its property including the *PGN FSRU Lampung*, incur additional indebtedness or guarantee other indebtedness, make investments or acquisitions, enter into intercompany transactions and make distributions.

\*       \*       \*

*Credit risk*

Credit risk is the exposure to credit loss in the event of non-performance by the counterparties related to cash and cash equivalents, restricted cash, trade receivables, net investment in financing lease, amounts due from affiliates and interest rate swap agreements. In order to minimize counterparty risk, bank relationships are established with counterparties with acceptable credit ratings at the time of the transactions. Credit risk related to receivables is limited by performing ongoing credit evaluations of the customers' or counterparty's financial condition. ***PGN guarantees PGN LNG's obligations under the PGN FSRU Lampung time charter.*** …

(Emphasis added.)

36.    The 2020 Annual Report stated, in pertinent part, the following regarding its debt, its relationship with Höegh LNG, and the COVID-19 pandemic:

***The debt levels of us and our joint ventures may limit our and their flexibility in obtaining additional financing, refinancing credit facilities upon maturity or pursuing other business opportunities or our paying distributions to you.***

*… **In addition, we have the ability to incur additional debt, and as of March 31, 2021 we had the ability to borrow an additional $66.8 million under our $85 million revolving credit facility with Höegh LNG** and $14.7 million on the $63 million revolving credit tranche of the $385 million facility, subject to certain limitations. If we acquire additional vessels or businesses, our consolidated debt may significantly increase. We may incur additional debt under these or future credit facilities. Our joint ventures' credit facilities will mature in November 2021 and June 2022, respectively, and require an aggregate principal repayment of approximately $337.9 million, of which 50% is our share. **A portion of the credit facility secured by the PGN FSRU Lampung will mature in October 2021 and requires that an aggregate principal amount of $15.5 million be refinanced. If such principal repayment is not refinanced, the export credit tranche of the PGN FSRU Lampung financing that will have an outstanding balance of $68.2 million at this time may be accelerated together with the attendant hedges.** …*

Our level of debt could have important consequences to us, including the following:

…

- *if we are unable to satisfy the restrictions included in any of our financing arrangements or are otherwise in default under any of those arrangements, as a result of our debt levels or otherwise, we will not be able to make cash distributions to you, notwithstanding our stated cash distribution policy.*

*Our ability to service or refinance our debt will depend on, among other things, our future financial and operating performance, which will be affected by prevailing economic conditions and financial, business, regulatory and other factors, some of which are beyond our control. If our operating results are not sufficient to service or refinance our current or future indebtedness, we will be forced to take actions such as reducing distributions*, reducing or delaying our business activities, acquisitions, investments or capital expenditures, selling assets, restructuring our debt, or seeking additional equity capital or bankruptcy protection. We may not be able to affect any of these remedies on satisfactory terms, or at all. *In addition, the recent COVID-19 outbreak has negatively impacted, and may continue to negatively impact, global economic activity, demand for energy (including LNG and LNG shipping) and funds flows and sentiment in the global financial markets. Continued economic disruption caused by the continued failure to control the spread of the virus could significantly impact our ability to obtain additional debt financing.*

\*     \*     \*

Our sources of liquidity include cash balances, cash flows from our operations, interest payments from our advances to our joint ventures, *our undrawn balance of $66.8 million under the $85 million revolving credit facility from Höegh LNG*…

(Emphasis added.)

37.     The statements contained in ¶¶ 27-36 were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) the Partnership was facing issues with the *PGN FSRU Lampung* charter; (2) as a result, the *PGN FSRU Lampung* charterer would state that it would commence arbitration to declare the charter null and void, and/or to terminate the charter, and/or seek damages; (3) the Partnership would need to find alternative refinancing for its *PGN FSRU Lampung* credit facility; (4) the *PGN FSRU Lampung* credit facility matured in September 2021, not October 2021 as previously stated; (5) the Partnership would be forced to accept less favorable refinancing terms with regards to the *PGN FSRU Lampung* credit facility; (6) Höegh LNG would not extend the revolving credit line to the Partnership past its maturation date; (7) Höegh LNG would reveal that it "will have very limited capacity to extend any additional advances to the Partnership beyond what is currently drawn under the facility"; (8) as a result of the foregoing, the Partnership would essentially end distributions to common units holders; (9) the COVID-19 pandemic was not the sole or root cause of the Partnership's issues in Indonesia, in 2019, before the pandemic, there were already a very low amount of demand in Indonesia for the Partnership's gas; (10) the auditing, tax, nor

42

maintenance of *PGN FSRU Lampung* were not the sole or root cause(s) of the Partnership's issues in Indonesia; and (11) as a result, Defendants' statements about its business, operations, and prospects, were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## THE TRUTH EMERGES

38.   On July 27, 2021, the Partnership issued a press release entitled "Höegh LNG Partners LP Declares Distributions and Announces Reduction in Quarterly Cash Distributions to Common Units" which announced the following, in relevant part:

> Höegh LNG Partners LP (the "Partnership") (NYSE: HMLP) today announced that its Board of Directors has ***reduced the Partnership's quarterly cash distribution to $0.01 per common unit, down from a distribution of $0.44 per common unit in the first quarter of 2021***, commencing with the distribution for the second quarter of 2021 payable on August 13, 2021 to common unitholders of record as of the close of business on August 6, 2021. ***The Partnership needs to conserve its internally generated cash flows to resolve issues related to the ongoing refinancing of the PGN FSRU Lampung credit facility as described below.*** The Partnership thereafter expects to use its internally generated cash flow to reduce debt levels and strengthen its balance sheet.
>
> \*      \*      \*
>
> The ongoing refinancing of the PGN FSRU Lampung credit facility, which had been scheduled to close by the end of the second quarter of 2021, is ***not yet completed due to the failure by the charterer of the PGN FSRU Lampung to consent to and countersign certain customary documents related to the new credit facility. By letter dated July 13, 2021, the charterer raised certain issues in relation to the operations of the vessel and its charter and by further letter dated July***

*27, 2021, has stated that it will commence arbitration to declare the charter null and void, and/or to terminate the charter, and/or seek damages.* Based on an initial legal review, the Partnership believes the charter's position is without merit. *These circumstances have left the Partnership exposed to having to arrange alternative refinancing, or rearrange the existing refinancing, in the short term in advance of the debt facility's maturity on September 29, 2021, which was originally expected to occur in October 2021.* We have commenced discussions with key lenders, and expect that the terms of any alternative refinancing, *if we are successful in finalizing such refinancing, are likely to be less favorable than the terms of the originally agreed refinancing*. No assurance can be given at this time as to the outcome of the dispute with the charterer of PGN FSRU Lampung, or of the aforementioned discussions with lenders. In the meantime, the PGN FRSU Lampung has continued to operate pursuant to the terms of the charter.

*The Partnership has received notice from Höegh LNG Holdings Ltd that the revolving credit line of $85 million will not be extended when it matures on January 1, 2023, and that Höegh LNG Holdings Ltd will have very limited capacity to extend any additional advances to the Partnership beyond what is currently drawn under the facility*. In addition, following the consummation of an amalgamation by Höegh LNG Holdings Ltd which closed on May 4, 2021, some provisions of the omnibus agreement entered into in connection with the IPO, terminated in accordance with their terms. With these recent changes, the Partnership's liquidity and financial flexibility will be reduced. In light of these factors, as well as current conditions in the FSRU market, which may heighten re-contracting risk, the Board of Directors believes that the Partnership should use its internally generated cash flow to reduce debt levels and strengthen its balance sheet.

Once the PGN FSRU Lampung situation is resolved, the Board of Directors will consider appropriate common unit distribution levels, if any, with a primary emphasis on managing the Partnership within the constraints of internally generated cash flows, deleveraging and maintenance of long-term financial sustainability.

John V. Veech, Chairman of the Board of Directors of Höegh LNG Partners LP, commented: "The Board of Directors has determined that

it is in the best interests of the Partnership moving forward to focus its capital allocation on deleveraging its balance sheet, strengthening its long-term financial sustainability, and enhancing its ability to operate the business within its internally generated cashflows. First, the Partnership needs to prioritize resolving the issues related to the ongoing refinancing of the PGN FSRU Lampung credit facility. With that near-term priority addressed, and by adjusting our capital allocation to conserve internally generated cashflows from our time charters, we are confident that we can reduce our debt levels, strengthen our balance sheet, and operate on a more sustainable basis in the context of an evolving FSRU market."

(Emphasis added.)

39.     On this news, the Partnership's common unit price fell $11.57 per common unit, or 64%, to close at $6.30 per common unit on July 28, 2021, on unusually heavy trading volume, damaging investors.

40.     On July 28, 2021, *Argus Media*, a news and consultancy group which produces price assessments and analysis of international energy and other commodity markets, published an article entitled "PGN to seek FSRU charter termination" which noted that "[u]tilisation at the Lampung import terminal has held low since it came on line in 2014, receiving just three cargoes so far this year, Vortexa data show, with no deliveries in 2020 and six a year earlier."

41.     On August 30, 2021, *Kontan*, an Indonesian business news organization, published an article entitled "Ingin batalkan sewa FSRU Lampung, PGN gugat Hoegh LNG ke Arbitrase Singapura" which discussed PT Perusahaan Gas Negara Tbk commencing arbitration proceedings with the Partnership at the

Singapore Arbitration Board (SIAC). The article also quoted the President Director of PT Perusahaan Gas Negara Tbk (PGAS), Muhammad Haryo Yunianto, stating that the problem is unfairness. The article further noted that Indonesian observers stated that the *PGN FSRU Lampung* is not optimal because of its high price, very low utilization rate, and that the Jakarta FSRU is sufficient which results in double storage.

42.   As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

43.   Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who acquired Partnership securities publicly traded on the NYSE during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Partnership, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

44.   The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Partnership securities were actively

traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

45.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

46.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

47.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and financial condition of the Partnership;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- whether the Defendants caused the Partnership to issue false and misleading filings during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false filings;

- whether the prices of Partnership securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

48.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

49.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Partnership securities met the requirements for listing, and were listed and actively traded on the NYSE, an efficient market;

- As a public issuer, the Partnership filed public reports;

- the Partnership communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

- the Partnership's securities were liquid and traded with moderate to heavy volume during the Class Period; and

- the Partnership was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

50.     Based on the foregoing, the market for Partnership securities promptly digested current information regarding the Partnership from all publicly available sources and reflected such information in the prices of the common units, and

Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

51.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

## COUNT I
### For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder Against All Defendants

52.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

53.     This Count is asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

54.      During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

55.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Partnership securities during the Class Period.

56.    Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Partnership were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Partnership, their control over, and/or receipt and/or modification of the Partnership's allegedly materially misleading statements, and/or their associations

with the Company which made them privy to confidential proprietary information concerning the Partnership, participated in the fraudulent scheme alleged herein.

57.     Individual Defendants, who are senior officers of the Partnership, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Partnership personnel to members of the investing public, including Plaintiff and the Class.

58.     As a result of the foregoing, the market price of Partnership securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of Partnership securities during the Class Period in purchasing Partnership securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

59.     Had Plaintiff and the other members of the Class been aware that the market price of Partnership securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which

Defendants did not disclose, they would not have purchased Partnership securities at the artificially inflated prices that they did, or at all.

60.    As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

61.    By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of Partnership securities during the Class Period.

### COUNT II
### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

62.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

63.    During the Class Period, the Individual Defendants participated in the operation and management of the Partnership, and conducted and participated, directly and indirectly, in the conduct of the Partnership's business affairs. Because of their senior positions, they knew the adverse non-public information about the Partnership's misstatement of revenue and profit and false financial statements.

64.    As officers of a public business, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Partnership's financial condition and results of operations, and to correct promptly any public

statements issued by the Partnership which had become materially false or misleading.

65.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Partnership disseminated in the marketplace during the Class Period concerning the Partnership's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Partnership to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Partnership within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Partnership securities.

66.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Partnership.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff, on behalf of himself and the Class, prays for judgment and relief as follows:

(a)     declaring this action to be a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of

the Federal Rules of Civil Procedure and designating plaintiff's counsel as Lead Counsel;

(b)     awarding damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, together with interest thereon;

(c)     awarding plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     awarding plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: October 27, 2021          **THE ROSEN LAW FIRM, P.A**

*/s/ Laurence M. Rosen*
Laurence M. Rosen, Esq.
One Gateway Center, Suite 2600
Newark, NJ 07102
Tel: (973) 313-1887
Fax: (973) 833-0399
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*